GARY Y. LEUNG (Cal. Bar No. 302928)
Email: leungg@sec.gov
DOHOANG T. DUONG (Cal. Bar No. 219127)
Email: duongdo@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Gary Y. Leung, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>AUSTIN DANGER ELLISON-MEADE,<br><br>　　　　Defendant. | Case No.<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a), and Sections 209(d), 209(e)(1) and 214 of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-9(d), 80b-

9(e)(1) & 90b-14.

2. Defendant has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

## SUMMARY

4. This case concerns a securities offering fraud perpetrated by defendant Austin Danger Ellison-Meade ("Ellison-Meade"), who solicited investments in Baycap.io, an investment club that he operated and managed as a pooled investment vehicle from at least February 2019 to May 2021. Ellison-Meade is the 24-year old "managing partner" of Baycap.io. He has never been registered with the Commission in any capacity or associated with any Commission-registered investment adviser. He claimed that he had developed a proprietary algorithm which accurately identified stocks that were poised for growth. Through these representations, Ellison-Meade raised approximately $2.8 million from 31 individual investors, telling them that he would use his proprietary algorithm to generate high investment returns, with very little risk to investor capital. Ellison-Meade's claims of profitable algorithmic trading were false – rather than investing their money as represented, he instead misappropriated investor funds from Baycap.io to pay his personal expenses and to make Ponzi payments. To conceal his fraud, Ellison-Meade also distributed fake account statements to investors in an effort to persuade them to maintain their investments with him, and to contribute even more capital to Baycap.io.

5. By engaging in this conduct, defendant Ellison-Meade: (i) violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a); (ii)

violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; and (iii) violated Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. § 80b-6(1), (2), and (4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8.

6. With this complaint, plaintiff SEC seeks a permanent injunction prohibiting future violations of the federal securities laws, a conduct-based injunction, an order requiring defendant Ellison-Meade to disgorge his ill-gotten gains along with prejudgment interest, and an order requiring Ellison-Meade to pay civil penalties.

## DEFENDANT

7. **Defendant Austin Danger Ellison-Meade**, age 24, held himself out as the managing partner of an investment club called Baycap.io. Ellison-Meade has never been registered with the Commission in any capacity, nor has he ever been associated with any Commission registrant.

## THE ALLEGATIONS

A. **Ellison-Meade's Fraudulent Baycap.io Securities Offering**

8. In early 2019, Ellison-Meade formed Baycap.io, a purported investment club, began raising capital for Baycap.io, and operated Baycap.io as an unregistered pooled investment vehicle.

9. Ellison-Meade held himself out as Baycap.io's managing partner and communicated in person, over the phone, and by email with potential investors.

10. Besides Ellison-Meade, no other person or entity played any role in the management of Baycap.io.

11. From at least February 2019 to May 2021 (the "relevant period"), Ellison-Meade raised at least $2.8 million from about 31 individual investors.

12. In doing so, Ellison-Meade used friends and family to help him identify and recruit potential investors.

13. Ellison-Meade sent partnership agreements to certain investors which documented their investments in Baycap.io.

14. Ellison-Meade had ultimate authority over both the content of the Baycap.io partnership agreements, and whether, how, and when to provide them to Baycap.io investors for their execution.

15. The Baycap.io partnership agreement provided that Baycap.io's purpose was "to invest the assets of the partnership solely in publicly traded individual corporate stocks and bonds, and mutual funds, and ETF's (Exchange Traded Funds) made up of those investments … for the benefit of the partners."

16. The Baycap.io partnership agreement stated that "[o]ne partner shall participate in the management and conduct the affairs of the partnership." In practice, Ellison-Meade exercised such authority.

17. The Baycap.io partnership agreement provided that the investment club's operator, Ellison-Meade, would be paid a 2% fee based on all capital contributions. In addition, the agreement provided that the managing partner, also Ellison-Meade, was entitled to a separate 20% fee on all investment profits.

18. When investing in Baycap.io, investors sent Ellison-Meade money via wire transfer or check, which he then deposited in bank accounts he controlled.

**B.    Ellison-Meade's False and Misleading Representations to Investors**

19. Ellison-Meade often pitched Baycap.io to potential investors in oral presentations.

20. When raising funds from Baycap.io investors, Ellison-Meade also provided some investors with written offering materials that described the proposed Baycap.io investment.

21. Ellison-Meade had ultimate authority over both the content of these written offering materials and whether and how to communicate those statements to investors and potential investors in Baycap.io.

### 1. Ellison-Meade represented that investors would receive high returns through his proprietary algorithm

22. As part of his investment pitch, Ellison-Meade stated that he had developed an algorithm for picking stocks, and that the algorithm could grow a $10,000 investment into more than $100,000 in one year of trading.

23. Ellison-Meade also claimed, at times, that he had created the algorithm for a class project. Ellison-Meade represented that after he had tested the algorithm's effectiveness using a dataset of historical stock prices, the algorithm had performed so well that his college professor then arranged for him to speak with an investment adviser who eventually opined that Ellison-Meade could sell the algorithm for millions.

24. Ellison-Meade told potential investors, as part of his investment pitch, that he had decided against selling the algorithm, and instead chose to use his algorithm to trade stocks for the benefit of a select group of investors drawn from his family and friends.

25. In written offering materials that he provided to some investors, Ellison-Meade further represented that when "Algo Trading," he was able to predict the NASDAQ through historical trends: "By focusing on simple variables I am able to find patterns across all of the NASDAQ regardless or [sic] type of investment, there is [sic] observable patterns that transcend the complex variables of a stock and as a result are impacting [sic] by all variables" and that "[B]y focusing on these simple variables we consistently predict growth within stocks at 69% accuracy and average almost 2% growth a day just based on the previous day's performance." Thus, according to Ellison-Meade's written offering materials, "[U]sing deep machine learning we can beat the market with high accuracy."

26. The written offering materials also claimed that Ellison-Meade's NASDAQ "Algo Trading" strategy "[b]eats all other investments," asserting that "[w]ith almost 2% average interest a day trading 4 days a week last year, we had

returns of almost 1300%" and that "[t]his year we have a projection of around 800%."

27. Other written offering materials included a line graph purporting to show a $10,000 investment in January 2018 growing to nearly $130,000 in value at the end of December 2018. Ellison-Meade claimed to one investor, based on the graph, that a one-year investment of $100,000 could expect to earn $300,000 in profit.

### 2. Ellison-Meade represented that investors faced little risk

28. As part of his investment pitch, Ellison-Meade also represented that he used various strategies to minimize the risk of investor loss.

29. For example, Ellison-Meade explained to one investor that he only traded stocks, bonds, and mutual funds, and that he reduced those positions to cash at the end of every trading day.

30. He also told a different investor that he traded different stocks every day.

31. Last, Ellison-Meade represented to investors that he had designed his proprietary trading algorithm with an automatic trigger that would limit any investor losses to 10%. And so when one investor asked Ellison-Meade if he could lose his entire investment, Ellison-Meade assured the investor that could not happen: "Worst case would be 10%. I have it set so that I cant [sic] lose more than 10%."

32. Finally, Ellison-Meade sought to entice investment when representing Baycap.io membership in written offering materials as an exclusive opportunity available to only a select few: "Most investment opportunities such as this are completely behind closed doors and never accept new investors," and that "[f]or now we are only going to be accepting 15 investors, this is due to the way we are structuring our investment pool."

### 3. Ellison-Meade represented that investments in Baycap.io were transparent and liquid

33. As part of his investment pitch, Ellison-Meade also emphasized the liquidity and transparency of investments in Baycap.io.

34. Ellison-Meade stated to investors and potential investors that an investment in Baycap.io was like a checking account, since investors would have ready access to information about their investment through a Baycap.io online portal.

35. Ellison-Meade represented to investors and potential investors that their investments were highly liquid, and that they could withdraw funds "in under a week."

C. **Ellison-Meade's Scheme to Misappropriate Funds and Make Ponzi-Like Payments**

36. Rather than investing their funds as represented, Ellison-Meade misappropriated investor funds for his personal use and to make Ponzi-like payments to other investors.

37. In the relevant period, Ellison-Meade raised at least $2.8 million from Baycap.io investors and then spent most of those funds on his personal expenses.

38. As one example, at the end of September 2019, an Ellison-Meade financial account had a balance of just $501. In early October 2019, however, the account received funds from two Baycap.io investors totaling $265,000. Over the first week of October, Ellison-Meade then spent more than $25,000 on luxury items from Rolex, Louis Vuitton, and Yves Saint Laurent, as well as $47,000 on private jet services.

39. In addition to misappropriating investor money for his personal use, Ellison-Meade used incoming investor funds to make Ponzi-like payments to other investors.

40. In the relevant period, Ellison-Meade transferred about $131,000 in purported investment gains to Baycap.io investors. However, most of that amount was funded by new investor capital.

41. Because of Ellison-Meade's misappropriation, most of Baycap.io's investors have not received their promised investment returns nor a return of their invested capital.

42. To further this fraud, Ellison-Meade engaged in a host of deceptive conduct. He led some investors to believe that their investments with Baycap.io were earning high profits by flaunting his expensive lifestyle, and by providing them with fake account statements. He sought to explain his inability to honor investor withdrawal requests with false excuses. Finally, Ellison-Meade also impersonated another individual, using a fake email account, in an effort to deflect the blame.

### D. Ellison-Meade's Representations of Algorithmic Trading, High Returns, Low Risk, Liquidity, and Transparency Were False and Misleading

43. Ellison-Meade represented that he would use investor capital to trade stocks, bonds, and ETFs through his proprietary trading algorithm.

44. No such securities trading occurred. Instead, Ellison-Meade misappropriated investor funds to pay his personal expenses and/or make Ponzi-like payments to other investors.

45. Ellison-Meade represented as well that investors would receive high investment returns through his algorithmic trading program.

46. Ellison-Meade's promised investment returns were an impossibility since he did not trade in securities with investor funds as represented.

47. Ellison-Meade represented that any investor losses would be limited due to various trading strategies and an automatic trigger he built into the algorithm.

48. Because Meade engaged in no actual securities trading and used investor funds for his own personal expenses and for Ponzi-like payments, Baycap.io investor losses were not limited to 10%.

49. Ellison-Meade further represented that investors could withdraw their invested funds at any time, subject to only a brief processing delay.

50. Ellison-Meade's claim of investment liquidity was false and Baycap.io investors were unable to withdraw their money as represented because Ellison-Meade had misappropriated their funds.

51. Ellison-Meade also represented that Baycap.io investors would be able

to track the performance of their investments through an online portal.

52. Ellison-Meade's claim of investment transparency was false because none of Baycap.io's investors ever received access to such a portal.

53. The false and misleading statements alleged above concerning Ellison-Meade's algorithm, and Ellison-Meade's corresponding claims of high returns, little risk of capital to investors, and investment liquidity and transparency, were all material to investors and potential investors in Baycap.io because reasonable investors would have considered it important when making their investment decision to know that Baycap.io would not pay Ellison-Meade's promised returns, to know that their losses would not be limited to 10% of their invested capital, to know that Ellison-Meade would not use their invested funds for securities trading but instead misappropriate them to pay his personal expenses and/or make Ponzi-like payments, and to know that Ellison-Meade would be consequently unable to return their invested capital within a few days of their request.

E. **Ellison-Meade Lulled Investors with Further Misrepresentations**

54. To conceal his fraud, Ellison-Meade lulled investors with more false and misleading representations.

55. Although investors in Baycap.io never received access to Ellison-Meade's represented online portal that would allow them to track their investments, Ellison-Meade provided some investors with fake account statements and invoices purportedly reflecting their promised gains.

56. For example, Ellison-Meade sent two investors statements that were supposedly for accounts Ellison-Meade had opened at a registered broker-dealer.

57. However, that broker-dealer has no record of any securities accounts corresponding to the names and account numbers appearing on the statements, and the statements provided by Ellison-Meade to those investors were fake.

58. Ellison-Meade sent other investors investment statements and documents that reflected supposed robust investment returns. These documents were fake as

well.

59. The false documents that Ellison-Meade provided to certain investors led them to believe that their Baycap.io investments were generating investment returns, and encouraged them to keep their capital invested with Ellison-Meade.

60. At other times, when Ellison-Meade was unable to honor an investor's request to withdraw their funds, Ellison-Meade offered various false excuses to explain his inability to return their money.

61. Ellison-Meade told some investors that they had made their request too late in the quarter to be processed.

62. He separately claimed that Baycap.io's brokerage firm was at fault for failing to release the funds.

63. In another instance, Ellison-Meade falsely claimed that he had accidentally used the wrong number in wire transfer instructions.

**F.     Ellison-Meade Acted With Scienter and His Conduct Was Negligent**

64. Ellison-Meade was Baycap.io's manager and he had sole authority to make all investment decisions on its behalf.

65. Ellison-Meade deposited the vast majority of investor capital in bank accounts that he controlled, as their sole signatory.

66. Ellison-Meade personally raised capital from defrauded investors by pitching them on his proprietary trading algorithm, and promises of high returns, liquidity, transparency, and low investment risk in Baycap.io.

67. Nonetheless, Ellison-Meade engaged in no meaningful securities trading with the investor funds he raised.

68. Moreover, Ellison-Meade took deliberate steps to conceal his fraud from Baycap.io investors through fake documents, false excuses, and other deceptive conduct.

69. Ellison-Meade knew, or was reckless in not knowing, that his representations of algorithmic trading, high investment returns, liquidity,

transparency, and low investment risk were false and misleading.

70. Ellison-Meade knew, or was reckless in not knowing, that through his conduct, he was misappropriating investor funds for his personal use and to make Ponzi-like payments to other investors.

71. Ellison-Meade's false and misleading representations of algorithmic trading, high investment returns, liquidity, transparency, and low investment risk were negligent, and in engaging in that conduct Ellison-Meade acted unreasonably.

72. Ellison-Meade's misappropriation of investor funds, lulling conduct, and other deceptive acts in furtherance of his fraud – providing fake account statements and false excuses for investor losses – were negligent, and in engaging in that conduct Ellison-Meade acted unreasonably.

**G.     Ellison-Meade Acted as an Investment Adviser**

73. Ellison-Meade controlled which securities were traded and when for the Baycap.io investment club, and the Baycap.io partnership agreements that Ellison-Meade had investors sign provided for him to receive compensation for his investment advice through a fee that was calculated based on the Baycap.io investment club's trading profits.

74. During the relevant period, Ellison-Meade was therefore engaged in the business of advising others as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, which he did in exchange for compensation.

75. Ellison-Meade therefore acted as an investment adviser when engaging in the conduct alleged by this complaint.

**H.     Baycap.io Investment Club Memberships Are Securities**

76. Ellison-Meade represented to investors and potential investors that Baycap.io members were investing money in an investment club.

77. When soliciting these investments, Ellison-Meade represented to investors and potential investor funds would be pooled and used to trade stock in a

brokerage account that Ellison-Meade would maintain on behalf of the investment club.

78. The Baycap.io partnership agreements that Ellison-Meade had investors sign also stated that investor funds would be pooled together in a financial account selected by the Baycap.io investment club partnership, and that "[s]ecurities owned by the partnership shall be registered in the partnership [sic] name." Ellison-Meade would then use those pooled funds to trade securities and make profit distributions to investors based on the overall net asset value of the partnership.

79. Accordingly, as represented to investors and potential investors by Ellison-Meade, the Baycap.io investment club pooled investor funds and interests, and the fortunes of each investor were linked to those of Ellison-Meade, the investment club's promoter.

80. The Baycap.io partnership agreements that Ellison-Meade had investors sign further provided that investors had no role in the selection of securities traded by Baycap.io, Baycap.io's trading strategy, the management or oversight of assets, or any profit calculations, allocations, and distributions.

81. Under the terms of the Baycap.io partnership agreements that Ellison-Meade had investors sign, investors were passive and they provided nothing beyond money for investment.

82. Accordingly, as represented to investors and potential investors by Ellison-Meade, all profits from investing in the Baycap.io investment club were to be derived solely from the efforts of Ellison-Meade, the investment club's managing partner.

83. The Baycap.io investment club memberships that Ellison-Meade offered and sold to investors and potential investors were therefore securities in the form of investment contracts.

**I.   Baycap.io is a Pooled-Investment Vehicle**

84. According to Ellison-Meade's representations to investors and potential

investors and the terms of the partnership agreements that Ellison-Meade had investors sign, the Baycap.io investment club held itself out as being primarily engaged in the business of investing in securities.

85. Baycap.io investment club memberships were not publicly offered.

86. Ellison-Meade raised funds from approximately 31 individuals that invested in Baycap.io investment club memberships.

87. Baycap.io was therefore a pooled investment vehicle.

## FIRST CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

88. The SEC realleges and incorporates by reference paragraphs 1 through 87 above.

89. Defendant Ellison-Meade's representations to investors and potential investors in Baycap.io of algorithmic trading, high investment returns, liquidity, transparency, and little investment risk were false and misleading because Ellison-Meade never used investor funds to trade in securities as represented. In addition, Ellison-Meade defrauded Baycap.io investors by misappropriating their funds for his personal use and to make Ponzi-like payments to other investors. And last, Ellison-Meade engaged in lulling and other deceptive conduct designed to conceal his fraud when he provided fake account statements and false excuses to investors.

90. By engaging in the conduct described above, Defendant Ellison-Meade, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other

persons.

91. Defendant Ellison-Meade, with scienter, employed devices, schemes and artifices to defraud; made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices or courses of conduct that operated as a fraud on the investing public by the conduct described in detail above.

92. By engaging in the conduct described above, Defendant Ellison-Meade violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act

93. The SEC realleges and incorporates by reference paragraphs 1 through 87 above.

94. Defendant Ellison-Meade's representations to investors and potential investors in Baycap.io of algorithmic trading, high investment returns, liquidity, transparency, and little investment risk were false and misleading because Ellison-Meade never used investor funds to trade in securities as represented. In addition, Ellison-Meade defrauded Baycap.io investors by misappropriating their funds for his personal use and to make Ponzi-like payments to other investors. And last, Ellison-Meade engaged in lulling and other deceptive conduct designed to conceal his fraud when he provided fake account statements and false excuses to investors

95. By engaging in the conduct described above, Defendant Ellison-Meade, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:  (a) employed devices, schemes, or artifices to

defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

96. Defendant Ellison-Meade, with scienter, employed devices, schemes and artifices to defraud; with scienter and/or negligence, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and, with scienter and/or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

97. By engaging in the conduct described above, Defendant Ellison-Meade violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3).

### THIRD CLAIM FOR RELIEF

**Fraud by an Investment Adviser**

**Violations of Sections 206(1) and 206(2) of the Advisers Act**

98. The SEC realleges and incorporates by reference paragraphs 1 through 88 above.

99. During the relevant period, Defendant Ellison-Meade was engaged in the business of advising others as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, which he did in exchange for compensation.  Ellison-Meade was therefore an investment adviser to Baycap.io and certain investors.  Ellison-Meade's representations to investors and potential investors in Baycap.io of algorithmic trading, high investment returns, liquidity, transparency, and little investment risk were false and misleading because Ellison-Meade never

used investor funds to trade in securities as represented. In addition, Ellison-Meade defrauded Baycap.io investors by misappropriating their funds for his personal use and to make Ponzi-like payments to other investors. And last, Ellison-Meade engaged in lulling and other deceptive conduct designed to conceal his fraud when he provided fake account statements and false excuses to investors.

100. By engaging in the conduct described above, Defendant Ellison-Meade, directly or indirectly, by use of the mails or means and instrumentalities of interstate commerce: (a) employed or is employing devices, schemes or artifices to defraud clients or prospective clients; and engaged in or is engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

101. By engaging in the conduct described above, Defendant Ellison-Meade has violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

## FOURTH CLAIM FOR RELIEF

### Fraud Involving a Pooled Investment Vehicle

### Violations of Section 206(4) of the Advisers Act and Rule 206(4)-8

102. The SEC realleges and incorporates by reference paragraphs 1 through 88 above.

103. During the relevant period, Baycap.io was a pooled investment vehicle and Defendant Ellison-Meade acted as that pooled investment vehicle's investment adviser. Ellison-Meade's representations to investors and potential investors in Baycap.io of algorithmic trading, high investment returns, liquidity, transparency, and little investment risk were false and misleading because Ellison-Meade never used investor funds to trade in securities as represented. In addition, Ellison-Meade defrauded Baycap.io investors by misappropriating their funds for his personal use and to make Ponzi-like payments to other investors. And last, Ellison-Meade

engaged in lulling and other deceptive conduct designed to conceal his fraud when he provided fake account statements and false excuses to investors.

104. By engaging in the conduct described above, Defendant Ellison-Meade, directly or indirectly, by engaging in the conduct described above, while acting as an investment adviser to a pooled investment vehicle, directly or indirectly, by use of the mails or means or instrumentalities of interstate commerce:  (a) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which there were made, not misleading, to any investor or prospective investor in the pooled investment vehicle; or (b) engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.

105. By engaging in the conduct described above, Defendant Ellison-Meade has violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8.

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendant committed the alleged violations.

### II.

Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining defendant Ellison-Meade, and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)]

and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 206 of the Advisers Act [15 U.S.C. § 80b-6] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

### III.

Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining defendant Ellison-Meade from, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security in an unregistered offering by an issuer, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account.

### IV.

Order Defendant to disgorge all funds received from his illegal conduct, together with prejudgment interest thereon, pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(3), § 78u(d)(5), & 78u(d)(7)].

### V.

Order Defendant to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

### VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VII.

Grant such other and further relief as this Court may determine to be just and necessary.

///
///
///

Dated: January 24, 2023

/s/ *Gary Y. Leung*
GARY Y. LEUNG
Attorney for Plaintiff
Securities and Exchange Commission